UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GENERAL ELECTRIC CAPITAL CORP., | : : : : : : : : | CIVIL ACTION NO. 3:09-CV-758 (JCH) |
| Plaintiff, | | |
| v. | | |
| GARY NICHOLS, Defendant. | | APRIL 29, 2011 |

**RULING RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND TO PRECLUDE EXPERT TESTIMONY (Doc. No. 46) AND DEFENDANT'S MOTIONS TO STRIKE (Doc. No. 56, 59)**

I.   INTRODUCTION

Plaintiff, General Electric Capital Corp. ("General Electric"), brings this action against defendant, Gary Nichols ("Nichols"), to recover pursuant to a loan General Electric issued to Nichols Equipment, LLC ("Nichols Equipment") and for which Nichols acted as a guarantor. Plaintiff now moves the court under Fed. R. Civ. P. 56, seeking summary judgment in its favor. In support of its Motion, General Electric also filed a motion to preclude the expert testimony of James Bodeker, which General Electric expected Nichols would offer in opposition to the Motion for Summary Judgment.

There appears to be no dispute that the debtor, Nichols Equipment, defaulted on its debt obligations to General Electric. The dispute, instead, is over the sale of the collateral used to secure the loan. General Electric seized and later sold a number of trucks purchased and maintained by Nichols Equipment. General Electric argues that this sale was conducted in a commercially reasonable manner, as required by Connecticut law. Nichols disagrees.

1

For the reasons articulated below, the court denies General Electric's Motion for Summary Judgment and to Preclude Expert Testimony (Doc. No. 46). In light of this Ruling, the court terminates Nichols' Motions to Strike (Doc. Nos. 56, 59) as moot.

## II.   FACTUAL BACKGROUND[1]

On December 14, 2007, General Electric and Nichols Equipment entered into a contract in which General Electric agreed to finance Nichols Equipment's purchase of six Mack trucks, each bearing a concrete pump manufactured by Schwing. L.R. 56(a)(1) Stmt. ¶¶ 1-2. The promissory note executed by the parties was secured by the trucks themselves, and amounted, in principal, to $3,306,542.17. Id.

As further security, Nichols signed an Individual Guaranty, also dated December 14, 2007. Id. at ¶ 9. In the Guaranty, Nichols agreed to pay any sum which became due under the loan agreement, whether the amount due represented "principal, interest, rent, late charges, indemnities, an original balance, an accelerated balance, liquidated damages, a balance reduced by partial payment . . . or any other type of sum of any kind whatsoever." Id. at ¶ 10.

Beginning in April 2009, Nichols Equipment failed to make its required payments. Id. at ¶ 13. By letters dated April 23 and 27, 2009, General Electric notified Nichols of Nichols Equipment's default and demanded payment under the Guaranty. Id. at ¶ 15. On May 8, 2009, General Electric filed the present action, to recover payment from Nichols pursuant to the Guaranty. See Compl. (Doc. No. 1)

---

[1] For the purposes of this section, undisputed facts will be cited to General Electric's Local Rule 56(a)(1) Statement (Doc. No. 47). In a number of instances, Nichols denies a particular fact, but fails to support this denial as required by the Federal Rules. See L.R. 56(a)(2) Stmt. ¶¶ 32, 34, 35, 42. The court will, therefore, treat these facts as undisputed. See Fed. R. Civ. P. 56(e)(2).

2

On August 10, 2009, in an action against Nichols Equipment, an Alabama Circuit Judge ordered the surrender of the six trucks, which General Electric obtained at some point that same month. L.R. 56(a)(1) Stmt. ¶ 19. Shortly after receiving the trucks, General Electric began preparations to sell them. Id. at ¶ 20. At General Electric's direction, Value Centers, LLC ("Value Centers") took possession of the trucks from Nichols Equipment. Id. at ¶ 21. Value Centers inspected the trucks and estimated a total value of $1,095,000. Id. at ¶ 24. This comported with General Electric's internal valuation of the trucks of $985,000. Id. at ¶ 29.

Value Centers placed advertisements on their website and in the paper and internet versions of two periodicals, Truck Paper and Machinery Trader. Id. at ¶ 32. General Electric does not indicate when these advertisements were placed or for how long. The only dated documentation is from an issue of Truck Paper dated October 9, 2009. Id. at ¶ 33. Value Centers also made several telephone calls to "existing contacts in the construction industry" to see if they were interested in the trucks. Id. at ¶ 34. No further description of these contacts is in the record before the court.

Value Centers received "a number of inquiries and offers." Id. at ¶ 35. Among these were an offer from a buyer based in the Middle East and an inquiry by a man named Pat from Pioneer Concrete Pumping Services, Inc. Id. at ¶¶ 37-38.[2] In September 2009, Value Centers received an offer from Pumpcrete, a company based in Toronto, to purchase three of the trucks for a total of $700,000. Id. at ¶ 39. Value Centers, at General Electric's direction, counter-offered $730,000. Id. at ¶ 40. When

---

[2] Nichols objects to Value Centers' description of the content of the call with "Pat" as hearsay. See Mot. to Strike at 2 (Doc. No. 56). In light of the court's Ruling denying General Electric's Motion, the court does not need to decide this issue and reserves its judgment for later proceedings.

Pumpcrete refused to accept the counter offer, General Electric directed Value Centers to accept the $700,000 offer. Id. Pumpcrete purchased the three trucks on September 29, 2009. Id.

A few weeks later, Value Centers located another buyer for one of the remaining trucks. Id. at ¶ 41. On October 14, 2009, Caselridge Concrete, also from Toronto, purchased the truck for $200,000. Id. Finally, on October 27, 2009, Pumpcrete purchased the two remaining trucks for $400,000. Id. at ¶ 42. Pumpcrete had initially offered $300,000 for the trucks, but, after a series of negotiations, Pumpcrete agreed to the final number. Id.

In total, General Electric sold the six trucks for $1,300,000. Id. at ¶ 43. After deducting Value Centers' commission from this figure, General Electric netted $1,196,000. Id. According to General Electric, after subtracting this sum from the total due under the Guaranty, Nichols still owes General Electric an amount not less than $2,490,451.26, plus "interest . . . , costs, expenses, and future attorney's fees, all of which continue to accrue." Id. at ¶ 45.

Nichols argues, in Opposition to General Electric's Motion, that General Electric conducted its sales in a manner contrary to Connecticut law. In support of this contention, Nichols cites to a Report prepared at his request by James Bodeker. See Bodeker Report (Aug. 31, 2010), Ex. 7 to Def.'s Opp. In this Report, Bodeker opines that the trucks were not sold, valued, or marketed in a commercially reasonable manner. Id. at 1, 4.[3]

---

[3] Bodeker's focus is on the value of the concrete pumps, which he says accounts for a much larger percentage of the value of the trucks than the vehicles the pumps are mounted on. Bodeker Report at 2.

4

Bodeker is the Vice President of Sales and Marketing at Pioneer Concrete Pumping Service, Inc. Id. at 6. He has been in the concrete pumping industry, in both sales and marketing, since 1994. Id. at 4. He has conducted or supervised the sale of over 1000 concrete pumps. Id.

Based on his review of the record in this case, including Value Centers' inspection reports, Bodeker concluded that the six Mack trucks and their attached pumps were substantially undervalued. See id. at 5. According to Bodeker, the trucks were, in the aggregate, worth $2,300,000. Id. Bodeker believed the difference in appraisals resulted from General Electric's calculations based on the year the trucks were manufactured (2007), as opposed to the year the concrete pumps were manufactured (2008), and the failure to take into account add-ons and specialized options. Id. at 3. Further, Bodeker concluded that the time frame between acquiring the trucks in August 2009 and the sale of the trucks in October 2009 was an unreasonably short period of time. Id.

Bodeker additionally disparaged General Electric's marketing techniques. He stated that there was no indication that General Electric contacted any of the major distributors of concrete pumps to help determine values, purchase the trucks, or remarket them. Id. Further, he noted that Truck Paper and Machinary Trader were "not reliable or standard resources for the sale of specialty equipment like concrete pumps." Id.

### III.  STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no

5

such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV. DISCUSSION

In light of the undisputed fact that Nichols Equipment defaulted on its debt obligations to General Electric, the only remaining question is what, if anything, does

6

Nichols owe to General Electric pursuant to his guaranty. This question, then, hinges on the disposition of the six Mack trucks used as collateral. Under Connecticut law,[4] if General Electric failed to act in a commercially reasonable manner when it disposed of these trucks, then it may be entitled to substantially less or even no recovery from Nichols. However, if General Electric can prove that it acted in a commercially reasonable manner, then it is entitled to full recovery (less the net value it received from the sale of the trucks).

In support of its Motion for Summary Judgment, General Electric seeks to preclude the testimony of James Bodeker in support of Nichols. Bodeker's Report, if permitted, would lend substantial support to the argument that General Electric did not act in a commercially reasonable manner and would create a material issue of fact, preventing the grant of summary judgment.

For the following reasons, the court denies General Electric's Motion to Preclude Bodeker's testimony. In light of this holding, the court concludes that there remain material issues of fact, and, thus, the court denies plaintiff's Motion for Summary Judgment.

    A.    <u>Motion to Preclude Bodeker's Testimony</u>

In Opposition to General Electric's Motion for Summary Judgment, Nichols produced a report by James Bodeker. Bodeker's analysis is short and concise, concluding that General Electric's valuation of the six trucks was too low and that General Electric failed to engage in commercially reasonable conduct with respect to

---

[4] The parties do not dispute the application of Connecticut law to this case.

marketing and reselling the vehicles.  Bodeker supplies his own valuation (almost twice that of General Electric) and suggests ways in which General Electric could have secured better deals.

A witness with "scientific, technical, or other specialized knowledge" may be qualified to testify based on such expertise.  Fed. R. Evid. 702.  A district court is assigned a "gatekeeping" role in determining whether expert testimony is permitted under the federal rules.  See United States v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011).  The court must ensure "'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)).  When assessing reliability, Rule 702 provides a number of nonexclusive factors to consider, including: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702; see Williams, 508 F.3d at 160 ("[T]hese criteria are not exhausitive.").[5]

General Electric makes a number of arguments in support of precluding Bodeker's testimony.  However, they can be summarized as (1) that Bodeker was not

---

[5] The Supreme Court in Daubert articulated a number of other factors that might also be considered by the district court.  See Daubert, 509 U.S. at 593-94.  However, the Daubert factors are inappropriate when testimony relates to customs and practices of an industry, as opposed to engineering or science.  See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 133 (2d Cir. 2006) ("'Daubert sought to clarify the standard for evaluating 'scientific knowledge' for purposes of admission under Federal Rule of Evidence 702. . . . . The affidavits of [plaintiff's experts] do not present the kind of "junk science" problem that Daubert meant to address.'" (quoting Iacobelli Constr., Inc. v. County of Monroe, 32 F.3d 19, 25 (2d Cir. 1994) (alterations in original)); see also Williams, 508 F.3d at 160 ("'Daubert's list of specific factors . . . neither necessarily nor exclusively applies to all experts or in every case.'" (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)).  Rather, a district court has "broad latitude when it decides how to determine reliability." Kumho Tire, 526 U.S. at 141.

8

qualified to render an appraisal and (2) that Bodeker's Report fails to satisfy the reliability requirements of Rule 702. For the reasons discussed below, the court disagrees with both of these assessments.

As an initial matter, Bodeker appears well-qualified to render an opinion in this case. He has spent sixteen years in the concrete pumping industry, primarily in sales but also in marketing. See Bodeker Report at 4, 6. Bodeker has sold or supervised the sale of over 1000 concrete pumps. Id. at 4. He has trained at a sales and service school operated by Schwing (the manufacturer of the concrete pumps in question), and he has managed as many as thirteen different concrete pump stores. Id.

General Electric makes much of the fact that Bodeker is not a certified appraiser and not aware of the Uniform Standard of Professional Appraisers Practice. See Pl.'s Mem. 15. While such credentials might well lend weight to his assessment, the court finds that Bodeker's substantial sales experience in the relevant industry is more than sufficient to qualify him to testify as to the valuation of the concrete pumps in question. See, e.g., In re Maple, No. 07-10820, 2008 WL 3539793, at *6 (Bankr. D. Vt. Aug. 8, 2008) ("Mr. Lebeau's experience in selling mobile homes—in particular, those built by the same company that manufactured Debtor's home— . . . qualifies him to opine on the most reasonable sale price for the Debtor's mobile home.").

General Electric's second argument takes a number of forms. First, General Electric argues that Bodeker lacked a factual basis for his Report. Additionally, General Electric argues that Bodeker utilized a suspect methodology in making his analysis. The court disagrees on both counts.

Bodeker had a sufficient factual basis to support his conclusions. He reviewed a

9

large number of the relevant documents in this litigation, including invoices, sales reports, inspection documents, photographs, and relevant depositions.  Bodeker Report 1-2.  Bodeker's failure to recall at his deposition every document that he reviewed in preparing his Report is neither surprising nor does it cause the court to question the competency of his assessment.  The one time that Bodeker stated that he definitely did not review a specific document (the Remarketing Agreement between General Electric and Value Centers), he stated that it was unnecessary for his analysis.  <u>See</u> Bodeker Dep. 77:15-25 (stating that the Remarketing Agreement was not relevant to his determination of whether the actual marketing techniques used were commercially reasonable).

Bodeker's mistaken understanding with respect to the relevant dates is also insufficient for this court to question the rigor of his opinion.  The difference between the five weeks disparaged in Bodeker's Report and the seven to nine week period discussed by General Electric is marginal.  There is no indication within the Report or the portions of Bodeker's Deposition cited by the parties to indicate that Bodeker's view would be any different had he considered the slightly longer period of time.

As to General Electric's second argument, a court "must focus on the principles and methodology employed by the expert." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 266 (2d Cir. 2002).  However, an expert does not have to "back his or her opinion with [evidence] that unequivocally support[s] his or her conclusions."  <u>Id.</u> Further, an expert may be qualified based solely "on his experience," and "such an expert must show how his or her experience . . . led to his conclusion or provided a basis for his opinion."  <u>SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC</u>, 467 F.3d

107, 132 (2d Cir. 2006) (internal quotation marks omitted).

The court concludes that Bodeker has sufficiently demonstrated that his analysis in this case is derived from his experiences in the concrete pumping industry. Bodeker's opinion that the failure to contact a major distributor of concrete pumps and the failure to advertise in appropriate sources are consistent with a view developed from sixteen years of sales experience. Additionally, with respect to the issue of valuation, Bodeker's reference to "Comparable Sales" and his description of his valuation technique—which he cites as being consistent with the technique used by the manufacturer of the pumps in question[6]—appear to be consistent with the systems the court would expect a salesperson in Bodeker's position to utilize.

"'[A] judge should only exclude evidence if [a] flaw is large enough that the expert lacks "good grounds" for his or her conclusions.'" Amorgianos, 303 F.3d at 267 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994)). This approach is consistent with "the liberal admissibility standard of the federal rules." Id. To the extent General Electric's arguments identify gaps or inconsistencies in Bodeker's Report, they are appropriately addressed at cross examination. See SR Int'l Bus. Ins., 467 F.3d at 134 ("'[T]he weight of the evidence is a matter to be argued to the trier of fact . . . .'" (quoting Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 186 (2d Cir. 2001) (first alteration in original)).

For these reasons, the court denies General Electric's Motion to Preclude

---

[6] General Electric objects that this is an unsupported fact. See Pl.'s Reply at 9. However, this fact was sworn to in an Affidavit by Bodeker, see Bodeker Decl. ¶ 3, Nov. 14, 2010, and is information the court assumes Bodeker would have, based on his sales training at Schwing, see Bodeker Report at 4. The court also notes that facts relied on by an expert in forming his opinion need not be admissible. See Fed. R. Evid. 703.

Bodeker's testimony.

B. Motion for Summary Judgment

Except where collateral "is perishable or threatens to decline speedily in value," a secured party is required to send notification to a debtor and any secondary obligor prior to disposing of collateral. Conn. Gen. Stat. § 42a-9-611(b)-(d). General Electric appears to have failed to provide Nichols with the required notification and does not allege that the trucks were perishable or at risk of rapidly losing value. Under Connecticut law, therefore, there is a rebuttable presumption that General Electric's sale of the Mack trucks was not commercially reasonable. See Conn. Bank & Trust Co. v. Incendy, 207 Conn. 15, 27 (1988). If General Electric fails to overcome this presumption, it may be prevented from recovering from Nichols. See Conn. Gen. Stat § 42a-9-626(a)(4) ("[T]he amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses and attorney's fees unless the secured party proves that the amount is less than that sum.").

"The reasonableness of a commercial resale is ordinarily a question of fact," Gaynor v. Union Trust Co., 216 Conn. 458, 478 (1990), and requires an examination of a variety of evidence, including "the amount of advertising done, the number of people contacted, normal commercial practices in disposing of the particular collateral, the length of time between the repossession and the sale, whether any deterioration in the collateral has occurred, the number of bids received, and the price obtained," Incendy, 207 Conn. at 28. In light of the court's denial of General Electric's Motion to Preclude Bodeker's testimony, the court concludes that there exist material issues of fact with respect to a determination of whether the disposition of the trucks was commercially

reasonable. Bodeker opined that the advertising used, the nature of General Electric's contacts, and the valuation of the trucks failed to comport with normal commercial practices. This opinion—together with the presumption—prevents the court from concluding, as a matter of law, that General Electric acted in a commercially reasonable manner.

For these reasons, the court denies General Electric's Motion for Summary Judgment.

## V. CONCLUSION

For the foregoing reasons, the court denies plaintiff's Motion for Summary Judgment and to Preclude Expert Testimony (Doc. No. 46). In light of this Ruling, the court terminates defendant's Motions to Strike (Doc. Nos. 56, 59) as moot.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 29th day of April, 2011.

    /s/ Janet C. Hall
Janet C. Hall
United States District Judge